UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**PETER CISZEWSKI AND MARLA MERANTE,**

                               **Plaintiffs,**

                      **V.**                                     **05-CV-00167 (NAM)**

**STATE OF NEW YORK, GOVERNOR GEORGE E. PATAKI
AND NYS DOT COMMISSIONER JOSEPH H. BOARDMAN,**

                               **Defendants.**

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

APPEARANCES:
Joshua A. Sabo, Esq.
421 New Karner Road
P.O. Box 15072
Albany, New York 12212
Attorney for Plaintiffs

Patrick F. MacRae, Esq.
New York State Attorney General - Syracuse Office
615 Erie Boulevard West
Suite 102
Syracuse, New York 13204
Attorneys for Defendants

**Hon. Norman A. Mordue, D.J.:**

**MEMORANDUM-DECISION AND ORDER**

**INTRODUCTION**

     In this action pursuant to 42 U.S.C. § 1983, commenced on February 7, 2005, plaintiffs claim that defendants acquired their property by way of a New York state condemnation proceeding which did not satisfy the requirements of the Due Process Clause. Plaintiffs moved for a preliminary injunction, and on February 11, 2005, this Court ordered defendants to show cause why an order should not be issued under Rule 65 of the Federal Rules of Civil Procedure enjoining defendants during the pendency of this action from: (1) altering the property formerly

owned by plaintiffs described in acquisition maps filed with the Essex County Clerk on August 10, 2004; and (2) enforcing further eviction proceedings against the plaintiffs. The Court further temporarily restrained defendants from altering the property in issue and from enforcing eviction proceedings against the plaintiffs, pending further order of the Court.

The Court now addresses the preliminary injunction motion. For the reasons set forth herein, the Court denies a preliminary injunction and vacates the temporary restraining order, effective seven days from the date of this Memorandum-Decision and Order.

## BACKGROUND

The facts set forth herein are undisputed unless otherwise noted. In August 1999, New York Department of Transportation ("DOT") completed a Draft Design Report/Draft Environmental Impact Statement ("DEIS") concerning the construction of a new bridge over the east branch of the AuSable River in Essex County, New York.[1] On August 13, 1999, DOT submitted the DEIS to the U.S. Department of Transportation Federal Highway Administration ("FHWA").[2] The DEIS included a detailed study of two possible alternative locations for the new bridge (the "upstream" location and the "downstream" location); a description of the public use, benefit and purpose to be served by the project; and information on the general effect of the

---

[1] The new bridge was needed to replace a temporary bridge which had been opened on July 3, 1997, after the old Jay Covered Bridge was found to be unsafe and closed to vehicular traffic. The project plan contemplates that the historic covered bridge will eventually be restored and maintained for pedestrian and bicycle use.

[2] It appears that DOT was required to obtain FHWA approval of the project because the project was governed by the federal Highway Bridge Replacement and Rehabilitation Program. *See* 23 U.S.C. § 144.

proposed project on the environment and residents of the area. A duly noticed public hearing took place on November 9, 1999, at which DOT and others addressed the two proposed alternative locations, the public benefit, and the general impact of the proposed project on the environment and local residents. On February 7, 2000, the Essex County Board of Supervisors issued a Resolution stating that it "hereby supports the siting and construction of a new bridge" at the downstream location.

On June 20, 2002, DOT submitted to FHWA the Final Environmental Impact Statement ("FEIS"). The FEIS relied on the conclusions in the DEIS regarding the public benefit and the general impact of the proposed project. In the FEIS, DOT recommended the downstream location and set forth a detailed discussion of the reasons for the recommendation and the anticipated impacts. FHWA approved the FEIS on August 6, 2002. On December 19, 2002, FHWA issued a Record of Decision approving the downstream location proposed in the FEIS. On December 30, 2002, DOT issued a Record of Decision which, along with the FHWA Record of Decision, completed the environmental analysis and public hearing phase of the project. On January 6, 2003, the Essex County Highway Superintendent approved the plan as described in the FEIS.

Meanwhile, on October 10, 2001, plaintiffs signed a contract to purchase a 68-acre parcel of land for use as their primary residence and for the commercial operation of a horse farm. The contract of sale stated that they were purchasing the property "with full knowledge that the property will be the future site" of the access roads to the future bridge, and that they were buying the property subject to the ability of the state and county to construct the roads. According to the complaint, the purchase was completed on January 24, 2002.

The downstream location of the project contemplated the fee taking of seven acres of plaintiffs' land. The seven-acre parcel does not encompass plaintiffs' personal residence, but rather is part of plaintiffs' commercial horse farming operation. The anticipated construction activity also necessitated the taking of a temporary easement.

Plaintiffs acknowledge that on May 6, 2004, they received a letter notifying them that DOT had started to acquire the property set forth in Map 7, apprizing them of the valuation of the property, and including an offer of compensation equal to the valuation. On May 14, 2004, in compliance with section 402(A)(1) of New York's Eminent Domain Procedure Law ("EDPL"), DOT filed Acquisition Map 7 depicting the seven acre parcel to be taken in fee. Plaintiffs took no action in response to this notice. They retained counsel in June 2004.

On June 25, 2004, DOT filed Map 18 describing the area to be taken as a temporary easement. On July 22, 2004, DOT delivered personally to plaintiffs' counsel a letter notifying them that DOT had started to acquire the easement set forth in Map 18, apprizing them of the valuation of the easement and including an offer of compensation equal to the valuation. Plaintiffs took no action in response to this notice.

On August 10, 2004, DOT completed the acquisition by filing Acquisition Maps 7 and 18 with the Office of the Clerk of Essex County pursuant to EDPL § 402(A)(3). In compliance with EDPL § 502, DOT served on plaintiffs notices of appropriation of both parcels by certified mail on August 23, 2004. Plaintiffs received the notices on August 28, 2004, but took no action to challenge the acquisition of their property although they were represented by counsel.

Plaintiffs did not vacate the acquired premises. DOT brought a summary proceeding in the Town of Jay Justice Court on December 20, 4004, to obtain possession. Plaintiffs, who were

represented by counsel, agreed to vacate the premises by February 8, 2005, and consented in open court to a Final Judgment of Possession. Justice Court issued a Final Judgment dated December 20, 2004, granting to DOT full possession of the acquired parcel. On February 7, 2005, plaintiffs commenced this action under 42 U.S.C. § 1983 by filing a complaint with the Clerk of this Court. Plaintiffs claim that defendants deprived them of their rights to due process under the Fourteenth Amendment as follows: failing to provide plaintiffs an opportunity for an adversarial hearing on the issue of the state's claimed exemption from the notice and hearing requirements of EDPL Article 2 (first cause of action); failing to provide an opportunity for judicial review of the same issue (second cause of action); failing to provide an opportunity for an adversarial hearing on whether the eminent domain proceeding was timely commenced (third cause of action); failing to provide an opportunity for judicial review of the same issue (fourth cause of action); and failing to provide plaintiffs with notice of the commencement of the acquisition procedure (fifth cause of action). Plaintiffs further challenge the constitutionality of EDPL § 402(A) in that it permits a taking without an adversarial proceeding or judicial review concerning the timeliness and propriety of the taking (sixth cause of action). They also assert that the exemption from the requirements of Article 2 violates the Uniform Real Property Acquisition Act (seventh cause of action). The Eighth cause of action is for attorney's fees pursuant to 42 U.S.C. § 1988. Plaintiffs seek an injunction which prohibits defendants from altering their property and from further proceeding to evict plaintiffs and which requires defendants to return the property to plaintiffs.

Presently before the Court is plaintiffs' motion for a preliminary injunction to prevent the defendants from altering the property described in maps filed by DOT with the Office of the

Essex County Clerk on August 10, 2004, and from enforcing proceedings against plaintiffs to evict them from the property.

## DISCUSSION

### *Rooker-Feldman* doctrine

The Court must first address defendants' argument that it lacks subject-matter jurisdiction. Defendants point out that the summary eviction proceeding in the Town of Jay Justice Court resulted in a Final Judgment of Possession dated December 20, 2004, granting full possession of the premises to DOT. Defendants urge that, under the *Rooker-Feldman* doctrine, the existence of the state court judgment regarding possession precludes this Court from assuming subject-matter jurisdiction over plaintiffs' challenge to the condemnation procedure.

The *Rooker-Feldman* doctrine recognizes that a federal district court lacks the authority "to review final judgments of a state court in judicial proceedings." *D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 482 (1983); *see Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923). On March 30, 2005, the Supreme Court decided *Exxon Mobil Corp. v. Saudi Basic Inds. Corp.*, clarifying the reach of the doctrine. 125 S.Ct. 1517 (2005). Noting that some lower courts had construed the doctrine "to extend far beyond the contours of the *Rooker* and *Feldman* cases," *id.* at 1521, the Supreme Court confined its applicability to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.* at 1521-22.

The Supreme Court further explained:

> Disposition of the federal action, once the state-court adjudication is complete, would be governed by preclusion law. The Full Faith and Credit Act ... requires the federal

> court to give the same preclusive effect to a state-court judgment as another court of that State would give. Preclusion, of course, is not a jurisdictional matter. In parallel litigation, a federal court may be bound to recognize the claim- and issue-preclusive effects of a state-court judgment, but federal jurisdiction over an action does not terminate automatically on the entry of judgment in the state court.

*Id.* at 1527 (citations and internal quotes omitted).

Applying these principles to the matter at bar, this Court finds that plaintiffs' complaint is not tantamount to an action complaining of injuries caused by a state-court judgment and inviting district court review and rejection of that judgment. Accordingly, the *Rooker-Feldman* doctrine does not operate to bar this Court from exercising jurisdiction over the matter despite the existence of the Justice Court's Final Judgment of Possession. *See id.* at 1521-22; *King v. State Educ. Dep't.*, 182 F.3d 162, 163 (2d Cir. 1999) (*Rooker-Feldman* does not bar plaintiffs' claim under federal law to recover monies paid by plaintiffs to defendant pursuant to order of New York State Family Court; Family Court has limited jurisdiction and could not have decided federal claims, thus federal action does not constitute an attempt to obtain federal-court review of the Family Court orders). Rather, the effect of the state-court judgment, if any, depends on the application of principles of preclusion.

Here, the fact that plaintiffs did not raise their due process claim in Justice Court in opposition to the eviction proceeding does not warrant the application of preclusive principles. Justice Court's jurisdiction over counterclaims is limited to "any counterclaim whose subject matter would be within its jurisdiction if sued upon separately." New York Uniform Justice Court Act ("UJCA") § 208. A review of Article 2 of UJCA establishes that Justice Court would not have jurisdiction over the issue plaintiffs now raise.[3] Inasmuch as plaintiffs could not

---

[3] UJCA § 204 provides: "The court shall have jurisdiction of summary proceedings to recover

properly have raised in Justice Court the issues they now raise, principles of preclusion do not apply to bar plaintiffs from bringing them here. *See Brody v. Village of Port Chester* ("*Brody II*"),[4] 345 F.3d 103,113-16 (2d Cir. 2003) (condemnee's federal claims not barred by *res judicata* despite his failure to raise them as counterclaims to EDPL Article 4 proceeding to take title to his property; under EDPL § 208 such claims could be brought only in Article 2 proceeding, not in Article 4 proceeding); *see also King*, 182 F.3d at 163.

***Younger* abstention**

The parties briefly address the issue of whether this Court should abstain from proceeding with this case under the doctrine of *Younger v. Harris*, 401 U.S. 37 (1971). Under the *Younger* doctrine, it is appropriate for a federal court to abstain from exercising jurisdiction where the following three factors are present: (1) there is an ongoing state proceeding; (2) an important state interest is implicated; and (3) the plaintiff has an avenue open for review of constitutional claims in the state court. *See Philip Morris, Inc. v. Blumenthal*, 123 F.3d 103, 105 (2d Cir. 1997). Here, acquisition of the property has been completed and there is no pending proceeding except the procedure under EDPL Article 5 for determining just compensation. There is no authority suggesting that plaintiffs can raise their present claims in the context of an Article 5 proceeding. Nor is there any basis to find that plaintiffs have any other state court avenue open for review of their present claims. Thus, there is no interest which would be served

---

possession of real property located in whole or in part within the municipality, to remove tenants therefrom, and to render judgment for rent due without regard to amount." UJCA § 202 gives justice courts jurisdiction of actions and proceedings to recover money or chattels where the amount or value does not exceed $3,000.

[4] An earlier appeal in the *Brody* case, *Brody v. Village of Port Chester*, 261 F.3d 288 (2d Cir. 2001), is cited hereinafter and is referred to as "*Brody I*."

by abstention and no reason why the Court should abstain from its duty to decide the controversy before it. Accordingly, the Court declines to abstain under the *Younger* doctrine.

**Preliminary injunction**

A party moving for a preliminary injunction must show 1) the threat of irreparable injury and 2) a likelihood of success on the merits. *See Carpenter Technology Corp. v. City of Bridgeport*, 180 F.3d 93, 97-98 (2d Cir. 1999). The "balance of hardships" alternative to a showing of a likelihood of success on the merits is not available where, as here, plaintiffs seek to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme. *See id.* at 98. Moreover, where a request for a preliminary injunction implicates public interests, the court "should give some consideration to the balance of such interests in deciding whether a plaintiff's threatened irreparable injury and probability of success on the merits warrants injunctive relief." *Brody v. Village of Port Chester* ("*Brody I*"), 261 F.3d 288, 290 (2d Cir. 2001) (quoting *Time Warner Cable v. Bloomberg, L.P.*, 118 F.3d 917, 929 (2d Cir. 1997)). The Court first addresses the likelihood of success on the merits.

**Likelihood of success on the merits**

Plaintiffs' principal contention is that they were denied an opportunity to challenge the procedure the state followed in condemning their property, and that if they had been given that opportunity, they would have prevailed because the state did not proceed in a timely fashion. Briefly, the condemnation procedure under New York law is as follows.

The first step in the condemnation procedure is the condemnor's determination of the need and location of a public project. EDPL Article 2 sets forth the procedure for such a determination. Ordinarily, the condemnor is required to conduct a public hearing, EDPL §§ 201-

203, and then to issue and publish a determination and findings specifying factors including:

> (1) the public use, benefit or purpose to be served by the proposed public project;
>
> (2) the approximate location for the proposed public project and the reasons for the selection of that location; [and]
>
> (3) the general effect of the proposed project on the environment and residents of the locality[.]

EDPL § 204(B).

In the case at bar, DOT claims that it was exempt from compliance with the provisions of Article 2 by virtue of its compliance with EDPL § 206(A).[5] Section 206(A) exempts a condemnor from the requirements of Article 2 when, prior to the acquisition, the condemnor has submitted to a governmental agency (*i.e.*, a state, federal or local governmental agency, board or commission) factors similar to those required by EDPL § 204(B), and has obtained from that governmental agency a license, permit, or other similar approval.

The next stage of the condemnation procedure is the acquisition proceeding under EDPL Article 4. A condemnor claiming to be exempt under section 206(A) must commence acquisition proceedings within three years after "the date of the order or completion of the

---

[5]
EDPL § 206 provides in part:
  The condemnor shall be exempt from compliance with the provisions of this article when:
> (A) pursuant to other state, federal, or local law or regulation it considers and submits factors similar to those enumerated in subdivision (B) of section two hundred four, to a state, federal or local governmental agency, board or commission before proceeding with the acquisition and obtains a license, a permit, a certificate of public convenience or necessity or other similar approval from such agency, board, or commission[.]

procedure that constitutes the basis of exemption[.]" EDPL § 401(A)(2).[6] If the condemnor fails to commence the Article 4 acquisition proceeding prior to the expiration of the three year period, "the project shall be deemed abandoned, and thereafter, before commencing [acquisition] proceedings ... the condemnor must again comply with the provisions of article two[.]" EDPL § 401(B); *see Binghamton Urban Renewal Agency v. Manculich*, 67 N.Y.2d 434, 438-39 (1986).[7] Thus, in addressing whether the acquisition proceeding was timely commenced within three years after the date of the relevant order or completion of the procedure that constitutes the basis of the exemption, the Court must consider (1) the date of the relevant order or completion of the procedure, and (2) when the acquisition proceeding was commenced.

First, with respect to when the three-year period began to run, that is, the date of the order or completion of the procedure that constitutes the basis of exemption, plaintiffs in this case contend that the relevant order is the Essex County Board of Supervisors' resolution, issued on February 7, 2000, supporting construction of the bridge at the downstream location. Defendants urge, however, that the date of the relevant order and the completion of the procedure was December 30, 2002, when DOT issued a Record of Decision following the FHWA's December

---

[6]
EDPL § 401 provides in part:
    (A) The condemnor may commence proceedings under this article to acquire the property necessary for the proposed public project up to three years after conclusion of the later of:
    ***
        (2) the date of the order or completion of the procedure that constitutes the basis of exemption under section two hundred six[.]

[7]
The purpose of the three-year limit is "not to provide a means of foreclosing development, but to assure that development is preceded at appropriate intervals by an environmental review process involving the affected community." *250 West 41st Street Realty Corp. v. New York State Urban Dev't Corp.*, 715 N.Y.S.2d 407, 408 (1st Dep't 2000) (citation omitted).

-11-

19, 2002 approval of the downstream location proposed in the FEIS.

The parties also dispute the date of the commencement of the Article 4 acquisition proceeding.[8]  For the present purposes, however, the Court need not determine the correct date of commencement.  All of the potential commencement dates occur in Spring or Summer 2004; thus, if plaintiffs are correct that the three-year period began to run on February 7, 2000, when the Board of Supervisors issued its resolution, the commencement of the acquisition proceeding on any of the 2004 dates was untimely.  If, however, defendants are correct and the three-year period commenced with the Record of Decision on December 30, 2002, the commencement of the acquisition proceeding in 2004 was timely.

It is not necessary or appropriate for the Court to make a final ruling on this issue at this point.  However, in light of the present record as summarized above, the Court finds that plaintiffs have fallen short of demonstrating a probability of success on the merits on the issue of the three-year limitations period in EDPL § 401(A)(2).  It does not appear on the present record that DOT's claim of exemption from EDPL article 2 was based on submission to the Essex County Board of Supervisors of the section 204(B) factors (*i.e.*, public benefit, location and impact).  As the FEIS demonstrates, the question of the project location was not finally resolved in the context of the Board of Supervisors' February 7, 2000 resolution "supporting" the downstream location.  Nor did that resolution address the other section 204(B) factors (*i.e.*, public benefit and impact) so as to constitute an approval within the meaning of section 206(A).

---

[8] Plaintiffs contend that the acquisition proceeding was commenced on June 25, 2004, when acquisition maps were filed with DOT.  Defendants contend that the acquisition proceeding was commenced on May 6, 2004, when the state notified plaintiffs that it was taking steps to acquire the property, and/or on July 22, 2004, when the state notified plaintiffs that it was also taking steps to acquire the temporary easement for construction purposes.

Therefore, the February 7, 2000 resolution does not likely constitute "the order or completion of the procedure that constitutes the basis of exemption" under section 401(A)(2).   Rather, it appears that DOT based its claim of exemption upon the review and decision by FHWA.  The record indicates that the project was funded by the federal Highway Bridge Replacement and Rehabilitation Program, 23 U.S.C. § 144, thus necessitating FHWA's involvement and approval.  DOT submitted to FHWA the three factors required by EDPL § 204(B) – *i.e.*, the public purpose, location, and general effect of the proposed project – when it submitted the DEIS to FHWA.  In the DEIS, DOT extensively addressed all three factors and concluded that the bridge should be constructed in one of two locations, the downstream or the upstream location.  It was not until it issued the FEIS that DOT definitively recommended that the bridge be placed at the downstream location.  And it was not until its December 19, 2002 Record of Decision that FHWA approved the downstream location.  This approval appears to be FHWA's final decision regarding the section 204(B) factors.  Thereafter, DOT issued its Record of Decision dated December 30, 2002.  Thus, it appears the procedure which constitutes the basis of the exemption, that is, the procedure whereby DOT submitted the section 204(B) factors to FHWA for consideration and approval under section 206(A), was completed either on December 19, 2002, or December 30, 2002.  Accordingly, the acquisition procedure, begun in Spring or Summer 2004, was commenced well within the three-year limit of section 401(A)(2).  Therefore, on the present record, plaintiffs have not shown a probability of success on this issue.

Further, plaintiffs have not shown that they have a meritorious basis to challenge the section 204(B) findings regarding the public benefit, the location or the impact of the project.  Plaintiffs have not shown a probability of success on other substantive grounds, nor have they

-13-

otherwise shown that, if they had been given the process they claim was their due, the outcome of the condemnation proceeding would have been different.

Moreover, it is arguable that plaintiffs were not actually deprived of due process. As noted, plaintiffs' due process claims center on the alleged lack of opportunity to contest the DOT's determinations that it was exempt and that it had timely commenced the Article 4 acquisition procedure. It is true that EDPL Article 2 does not provide for judicial review of a section 206(A) exemption determination or of the section 204(B) factors in cases where, as here, the condemnor proceeds pursuant to a section 206(A) exemption.[9] *See* EDPL §§ 207, 208. However, it is arguable that plaintiffs could have raised the same issues in a challenge to the Article 4 acquisition under Article 78 of New York Civil Practice Law and Rules. *See generally In re Acquisition of Real Prop. by the County of Tompkins*, 654 N.Y.S.2d 849 (3d Dept. 1997); *Villella v Department of Transp.*, 534 N.Y.S.2d 574 (3d Dept. 1988). It is undisputed that plaintiffs received actual notice of the acquisition proceeding on May 6, 2004. The May 6 notice, in compliance with section 402(A)(2), informed plaintiffs that DOT had "started to acquire" the property and that it was anticipated that the state would acquire title "within the near future." Plaintiffs obtained counsel in June 2004. Thus, plaintiffs may be unable to show that they were actually deprived of opportunities to challenge the determinations of which they complain.

---

[9] New York appellate courts have characterized this omission as an ambiguity in need of legislative correction, and, in cases (unlike the instant case) wherein the condemnor was required to obtain a court order of acquisition under section 402(B), the courts have permitted condemnees to obtain review of determinations of exemption and underlying Article 2 issues in the context of a challenge to an Article 4 acquisition. *See City of Buffalo Urban Renewal Agency v. Moreton*, 473 N.Y.S.2d 278, 283 (4th Dep't 1984); *County of Monroe v. Morgan*, 443 N.Y.S.2d 467, 468 (4th Dep't 1981).

On the present record, plaintiffs have not demonstrated a likelihood of success on the merits. The Court recognizes that, upon a showing that they were denied procedural due process, plaintiffs would be entitled to recover nominal damages even absent any other injury. *See Brody II*, 345 F.3d at 112. The possibility of a recovery of nominal monetary damages, however, is not the type of success on the merits which would warrant preliminary injunctive relief in this case.

**Irreparable injury to plaintiffs**

Plaintiff Peter Ciszewski ("Ciszewski") submits an affidavit stating that "[t]he taking and eviction cuts our house, barn, water and utilities and every building we have to take care of our horses off from the remainder of the farm on which we must raise the horses. The changes to our farm will cause irreparable harm to Marla and I, our horses, and our entire way of life[.]" Ciszewski's affidavit admits that defendants have assured plaintiffs that DOT would provide them with a means of access across the acquired property at all times. Ciszewski states that he does not believe such access will be provided and that without such access, "the trisection of our farm will destroy our primary pastures and cut off access to our water and utilities, barn, shelters and our home from the rest of the farm."

Ciszewski's affidavit also states that plaintiffs had endured a winter eviction from a farm they were leasing in 2000 and 2001 and that it was an experience they did not want to repeat. With respect to the farm they now own, he states that "[t]he driveway leading from the road a half-mile away is inaccessible during heavy snows and for about a month during our mud season. There is no practicable way to feed and water our horses during those times." He also indicates that they will be unable to "quarantine" horses because they will be unable to drive

-15-

fenceposts into the frozen ground in a short time during the winter.

A substantial portion of the injuries plaintiffs allege arise from the winter weather and the effect of construction activities on their access to portions of their property.  Due to the passage of time, plaintiffs' concerns regarding the winter weather are obviated.  With respect to access, Osvaldo Priotti, DOT Project Manager, states in his affidavit:

> Throughout the course of contact with the plaintiffs, they have been assured that DOT would provide them with a means of access across the acquired property throughout the construction process in order to make continuously available to them areas of their commercial property separated by the acquisition.
>
> In light of this continued access between the separated areas of plaintiffs' commercial horse farming operation, there is nothing that would prevent plaintiff from continuing to operate his business.

(Paragraph numbering omitted.)  Assuming that such access is provided, there is no basis on this record to find that plaintiffs will sustain substantial injury as a direct result of the construction activity.

Plaintiffs also claim they will be injured by denial of the preliminary injunction because they will be wrongfully deprived of their property.  Wrongful deprivation of property certainly constitutes injury.  However, in view of the Court's finding that plaintiffs have not demonstrated a probability of success on the merits, this argument does not aid plaintiffs.  Accordingly, the Court finds plaintiffs have not shown significant irreparable injury.

**Public interest**

As noted, where a request for a preliminary injunction implicates public interests, the court must "give some consideration to the balance of such interests in deciding whether a plaintiff's threatened irreparable injury and probability of success on the merits warrants injunctive relief." *Brody I*, 261 F.3d at 290.  Plaintiffs' request for a preliminary injunction in

this case obviously implicates public interests.

In addressing the balance between plaintiffs' interests and the public's interests, the Court observes that the public has a strong interest in the construction of the proposed permanent bridge to replace the single-lane temporary bridge erected in July 1997 after the covered bridge was found to be dangerous. The public need for the bridge was addressed extensively in the DEIS. The DEIS found that the approach roads to the temporary bridge have sight-distance limitations which create hazards for pedestrians and bicyclists. The DEIS also found that concrete blocks placed along the side of the approach roadways at both ends of the temporary bridge (in order to prevent vehicles from running off the road and possibly into the river) "present a hazard to the motoring public." The DEIS noted that the elevation of the temporary bridge renders it susceptible to flooding and damage from ice and stated that "[d]uring periods of flooding, all traffic (including buses and emergency vehicles) must be re-routed." The DEIS further noted that improved mobility would enhance economic development in the area, including facilitating tourism and employment. The DEIS stated:

> Due to the one lane nature of the temporary bridge, and the non-standard geometric features of the existing approach roadways, neither the motoring public, pedestrians nor bicyclists are well served. Deterioration of local town and country roads used for detours is exacerbated by any unnecessary traffic these roads are exposed to. The mobility of both people and goods in the overall area would be greatly enhanced by improvements that would provide improved access across the East Branch of the AuSable River.

Moreover, the record demonstrates that the public has an interest in construction of the bridge at the downstream location, which was selected after extensive investigation and discussion. FHWA's Record of Decision concludes that the downstream alternative "does cause the least impact to the scenic vista and recreational activities" in the area and "meets all of the

project goals and objectives."

On the issue of the public interest, the Court further considers the affidavit of Richard Frederick, DOT Regional Construction Engineer, who states:

> Subsequent to the filing of the aforesaid appropriation maps by the DOT on August 10, 2004, a construction contract to build Essex County Road Number 22 was let to the general contracting firm of Luck Bros., Inc., whose main office is located in Plattsburgh, New York.
>
> The aforesaid construction contract provided for the contractor to have access to the portion of land covered by the aforesaid Maps 7 and 18 upon a portion of the former premises of plaintiffs as of October 5, 2004.
>
> Upon information and belief, due to this pending litigation, the contractor has not been able to access the premises appropriated by the DOT for construction purposes. The cost to the public for continuing delays in providing access to the contractor of this premises could, upon information and belief, be in the range of from $87,600.00 to $108,500.00 on a monthly basis.
>
> Therefore upon information and belief, the public and the NYS DOT will suffer substantial financial harm for every month access to the appropriated premises is denied to the general contractor for the purpose of constructing and completing the road and bridge project denominated as Essex County Road Number 22.

(Paragraph numbering and citations to record omitted.) Accordingly, the record demonstrates that the public has a substantial interest in the prompt construction of the bridge.

## CONCLUSION

To conclude, the Court finds that defendants have shown that the public would suffer substantial harm if a preliminary injunction were granted. Plaintiffs have not shown that they would sustain significant harm either due to the weather or resulting from construction activities. This conclusion is based in part on the affidavit from Osvaldo Priotti stating that DOT would provide plaintiffs with a means of access across the acquired property throughout the construction process in order to make continuously available to them areas of their commercial

-18-

property separated by the acquisition.  The Court further finds that plaintiffs have not demonstrated that, if they had received the process which they claim was their due, the outcome of the condemnation proceeding would have been different or that they will otherwise be entitled to more than nominal relief for any deprivation of due process.  Thus, the Court finds that plaintiffs have not demonstrated a likelihood of success on the merits or irreparable injury warranting a preliminary injunction.  Particularly in light of the strength of the countervailing public interest in proceeding with a project which has been shown to be necessary for public safety and well-being and in avoiding unwarranted costly delay, the Court denies plaintiffs' motion for a preliminary injunction. [10]

In view of the Court's reliance on the Priotti affidavit in evaluating plaintiffs' injuries and the obvious importance to plaintiffs of access across the acquired property throughout the construction period, the Court hereby directs defendants to ensure that such access is provided at all times.

It is therefore

ORDERED that the motion for a preliminary injunction is denied; and it is further

ORDERED that the temporary restraining order dated February 11, 2005, is vacated, effective seven days from the date of this Memorandum-Decision and Order; and it is further

ORDERED that New York Department of Transportation is directed to ensure that plaintiffs are provided with a means of access across the acquired property throughout the construction process in order to make continuously available to them the areas of their

---

[10] The Court accepts defendants' supplemental papers filed May 19, 2005 (Dkt. No. 32) and plaintiffs' letter response dated May 24, 2005 (Dkt. No. 33), although in view of the Court's analysis they do not affect the outcome.

commercial property separated by the acquisition.

    IT IS SO ORDERED.

May 26, 2005
Syracuse, New York

Norman A. Mordue
U.S. District Judge